AO 106 (Rev. 04/10) Application for a Search Warrant

FILED
RICHARD W. NAGEL
CLERK OF COURT
2/2/21

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

101 Bennington Dr., Dayton, Ohio 45405

Case No. 3:20-mj-40

Elizabeth Preston Deavers

## APPLICATION FOR A SEARCH WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A-1

located in the Southern District of Ohio, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC s. 841(a)(1) | possession with intent to distribute controlled substances |
| 21 USC s. 846 | conspiracy to distribute/possess with intent to distribute controlled substances |

The application is based on these facts:
See Attached Affidavit of Robert Buzzard

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: ____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Robert M. Buzzard*
Applicant's signature

Robert Buzzard, SA of the FBI
Printed name and title

Sworn to before me and signed in my presence via facetime.

Date: February 2, 2021

City and state: Columbus, Ohio

Elizabeth A. Preston Deavers, US Magistrate Judge
Printed name and title

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Robert Buzzard, hereby duly sworn, declare and state:

## INTRODUCTION

1. I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI"), assigned to the Cincinnati Division, Dayton, Ohio Resident Agency. I therefore am an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 21 U.S.C. § 878. Moreover, I am an "investigative law enforcement officer" within the meaning of 18 U.S.C. § 2510.

2. I have served as an FBI SA since January 2002. I am currently assigned to the Cincinnati Division, Dayton Resident Agency and serve on the FBI's Southern Ohio Safe Streets Task Force (SOSSTF). Since 2002, I have participated in investigations involving narcotics trafficking and have received specialized training on the subject of narcotics trafficking and money laundering from the FBI. I have been personally involved in investigations concerning the possession, manufacture, distribution, and importation of controlled substances, as well as methods used to finance drug transactions. Based on my training and experience – including my participation in the investigations referenced above – as well as discussions and interactions with other experienced FBI SA's, Task Force Officers ("TFO"), and narcotics investigators, I am familiar with the manner in which drug traffickers and their organizations operate within the United States. Based on my aforementioned training and experience, I am familiar with the modus operandi of persons involved in the illicit distribution of controlled substances and as a result, knows the following:

   a. It is common practice for drug traffickers to hide their assets, their addresses, their telephone numbers and beeper/pager services by using other person's names in order to avoid detection by law enforcement officials.

1

b. It is common practice for drug traffickers to often maintain residences which are used as "stash houses" or locations for drug storage and distribution, and use "nominees" to obtain telephone service, utility service, and other services to hide the true identity of the owner or person who will use that service.

c. That drug traffickers often place assets in corporate entities in order to avoid detection of those assets by law enforcement officials.

d. It is common practice, that even though these assets are in nominee names, drug traffickers will continue to utilize these assets by exercising dominion and control over them.

e. It is common practice that drug traffickers possess large amounts of U.S. Currency in order to finance their ongoing illicit drug business.

f. It is common practice that drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of drugs. Drug traffickers commonly front (provide drugs on consignment) to their clients. The books, records, receipts, notes, ledgers, and other documents are kept where the drug traffickers have ready access to them.

g. It is common for drug traffickers to provide false information to law enforcement officials regarding their identity and the address of their actual residence.

h. That persons involved in drug trafficking conceal from law enforcement in their residences, vehicles, and businesses the following items: drugs, large amounts of currency, financial instruments, jewelry, automobile titles, other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to the acquisition and concealment of large sums of money resulting from drug trafficking activities.

i. When drug traffickers amass large proceeds from the sale of drugs, they attempt to hide the true source of these profits, otherwise known as laundering the money. To accomplish this, drug traffickers many times utilize banks and/or financial institutions with their attendant services, including but not limited to, cashier's checks, money drafts, and letters of credit. Other entities used to launder drug proceeds include real estate firms and purported legitimate business fronts.

j. Drug traffickers commonly travel to facilitate their trafficking activities. After purchasing drugs, traffickers commonly transport, or cause to be transported, drugs to areas in which they will be distributed. Common methods of transportation include, but are not limited to, commercial airlines, and rental/private automobiles.

k. It is common practice that drug traffickers commonly maintain books and similar documents which reflect names, addresses, and/or telephone numbers of their

2

associates in the drug trafficking organization. This information can often be stored in cellular phones in places such as the contacts list.

l. Drug traffickers often take, or cause to be taken, photographs of themselves, their associates, their property and their product, and that the photographs are usually maintained at the residences and/or businesses of drug traffickers. Photographs such as these can commonly be found and stored in cellular phones.

m. Drug traffickers commonly have in their possession, (that is on their person, at their residence, and/or their business) weapons, including firearms of various types. Firearms are used to protect and secure a drug trafficker's property which may include, but is not limited to, narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency.

n. Drug traffickers frequently maintain hidden compartments within their residence and vehicles to hide drug trafficking evidence (money, ledgers, drugs, etc.), bury evidence in containers such as shoe boxes, or hide the evidence in safes.

o. The exact quantities, prices, dates, and methods of delivery of drugs are seldom discussed in detailed terms over the telephone. These details are usually agreed upon during face-to-face transactions. For this reason, most telephone conversations regarding drugs are very brief and often in code, understood by the traffickers and designed to mislead or confuse non-participants of the conversations. Drug traffickers make extensive use of cellular phones and text messaging beepers/pagers to facilitate contacting one another. When calling a beeper or text messaging, traffickers commonly input the number that should be called and sometimes add additional instructions in the form of additional digits. The structure of a drug distribution organization usually consists of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers. The wholesale distributors often have more than one source of supply, and likewise the retail distributors often obtain drugs from more than one wholesale distributor. After receiving a quantity of drugs, the source of supply will often move the drugs to a location other than where he/she sells them to the wholesale distributors. The location of the source of supply's so-called "stash house" is generally a well-guarded secret known only to the source of supply and his closest associates. Most of the drugs, as well as diluting and packaging materials and weighing equipment, are usually kept at the "stash house." Only those amounts needed for immediate sale are usually kept at the point of sale.

p. Drug traffickers frequently use rental vehicles for everyday travel and will maintain another vehicle, usually at an out of sight location, to facilitate their drug trafficking business.

q. Evidence of past communication between drug traffickers can be found in saved or deleted text messages, call logs, and other forms of electronic communication occurring over, stored in, or accessed by the cellular phone.

    r.    I have repeatedly encountered a practice wherein drug traffickers distribute a cellular telephone number to their drug customers, often described by traffickers as a "money phone." The money phone is used primarily to communicate with those customers. The customers will subsequently call the trafficker on that cellular telephone number to arrange a purchase of drugs as needed. The trafficker will many times field calls from several customers at once, and then direct all those customers to travel in their car to a designated meeting point. Once all the customers have driven to the designated place, the drug trafficker will appear in his vehicle, quickly conduct hand to hand drug transactions with each customer, and then drive away.

## PURPOSE OF AFFIDAVIT

3.    I make this affidavit in support of applications for search warrants at the following residences – namely:

    a.    101 Bennington Dr., Dayton, Ohio 45405, including any outbuildings, garages, or sheds located on its curtilage (hereinafter "**Location 1**"). **Location 1** is described more fully in Attachment A-1, which is incorporated herein by reference;

    b.    3821 Cavanaugh Rd, Dayton, Ohio 45405, including any outbuildings, garages, or sheds located on its curtilage (hereinafter "**Location 2**"). **Location 2** is described more fully in Attachment A-2, which is incorporated herein by reference.

4.    As detailed more fully below, I submit that there is probable cause to believe that evidence of a crime as well as contraband, fruits of a crime or other items illegally possessed in relation to the following offenses exist and can be found inside **Location 1** and **Location 2** – namely:

    a.    Possession with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, § 841, and

    b.    Conspiracy to Possess with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, § 846.

5. A list of specific items to be seized from the premises described above is attached hereto as Attachment B, and Attachment B is incorporated herein by reference. Based on my training and experience as well as the facts contained in the affidavit, I believe that there is probable cause to believe that the items listed in Attachment B will be found at the premises described above. I have not included every detail of the investigation, but only information necessary to establish probable cause that evidence associated with above-described drug trafficking offenses is located at **Location 1** and **Location 2**.

## PROBABLE CAUSE

6. In January 2021, Detectives and Task Force Officers with the Warren County Ohio Drug Task Force (WCDTF) began coordinating a narcotics investigation with me and members of the FBI's Southern Ohio Safe Streets Task Force in Dayton, Ohio. During the investigation, the law enforcement team identified Aaron Benson as a mid-level drug trafficker from Dayton, Ohio, who distributes narcotics in the Warren County area. A Detective with the WCDTF, working in an undercover capacity (hereinafter referenced as "UC"), established communication with Benson at cellular telephone number 937-267-2970 for the purpose of coordinating future narcotics transactions. During early communications between the UC and Benson via cell phone, Benson offered to sell the UC one pound of crystal methamphetamine. Benson even sent the UC a picture via text message of what appeared to be a large quantity of methamphetamine on a digital scale. The picture appeared to have been taken inside a residence, with the suspected drugs sitting on a wooden table.

7. On or about January 20, 2021, members of the WCDTF and the UC coordinated the first undercover purchase of crystal methamphetamine from Benson in Springboro, Ohio. On that date, the UC communicated with Benson at cellular telephone number 937-267-2970 to

order the crystal methamphetamine. Thereafter, Benson traveled to the pre-determined meet location in Springboro, Ohio, driving a silver Buick sedan, bearing Ohio license plate number JEV3112. A registration check revealed the vehicle was registered in Benson's name. An unknown black male passenger was with Benson when he arrived. During the meeting, the UC provided Benson $800 in pre-recorded U.S. currency, and Benson provided the UC two ounces of suspected crystal methamphetamine. Following the transaction, WCDTF members surveilled Benson and observed him travel north on Interstate 75 toward Dayton. The suspected two ounces of crystal methamphetamine was field tested by WCDTF members and indicated the positive presence of methamphetamine.

8. I am familiar with Benson through a prior FBI investigation wherein Benson was charged and convicted in the Southern District of Ohio (case number 3:16CR090) for Felon in Possession of a Firearm, in violation of Title 18, United States Code, Sections 922(b)(1) and 924(a)(2). Benson was subsequently sentenced to 27 months incarceration but is now out of prison and on federal supervised release. Benson's home address per his supervised release reporting is **Location 1**. I am also aware Benson has prior felony convictions in Montgomery County, Ohio, Common Pleas Court for Possession of Heroin in 2012 and Possession of Cocaine in 2015.

9. On the morning of January 21, 2021, I conducted surveillance at **Location 1** and observed Benson's silver Buick sedan parked at the residence.

10. On or about January 25, 2021, the UC arranged (via cellular telephone communications) a second purchase of crystal methamphetamine from Benson. Prior to the meet, I established surveillance at **Location 1**, and Benson's vehicle was parked at the residence. Thereafter, the UC made contact with Benson via cell phone and confirmed the location and

amount for the drug transaction. Following that confirmation, I observed Benson leave **Location 1** driving his vehicle. Benson subsequently arrived at the pre-determined meet location in Springboro, Ohio driving his vehicle. An unknown black male passenger was also present in Benson's vehicle. During the meet, the UC provided Benson $800 in pre-recorded U.S. currency, and Benson provided the UC two ounces of suspected crystal methamphetamine. Following the transaction, surveillance units followed Benson north on Interstate 75 to the city limits of Dayton before Benson appeared to perform a counter surveillance move by quickly crossing three lanes of traffic to take an exit. Following that move, surveillance on Benson was discontinued. Based on the events of this transaction – namely, Benson leaving **Location 1** following his conversation with the UC and then directly proceeding to the meet location – I believe that Benson kept and maintained at **Location 1** the methamphetamine that he distributed to the UC that day.

11. On or about January 28, 2021, WCDTF members arranged a third undercover purchase of crystal methamphetamine from Benson via cellular telephone communication. Prior to the drug deal, I established surveillance at **Location 1**. I observed Benson arrive at the residence driving his vehicle. After Benson arrived at **Location 1**, the UC contacted Benson via cell phone and confirmed the purchase of three ounces of crystal methamphetamine for $1,200. After Benson confirmed the meet, I observed Benson leave **Location 1** in his vehicle. I and FBI Task Force members followed Benson to **Location 2** where he parked his vehicle in the driveway and entered the residence. I also noted a black sedan parked next to Benson's vehicle in the driveway; however, I was not able to obtain a make, model or license plate number on the vehicle before it left **Location 2**. A short time thereafter, the UC began receiving cellular telephone communications from Benson indicating Benson wanted to switch the meet location to

the Dayton Mall area and that he (Benson) would be sending his "dude" to deliver the narcotics. Benson informed the UC his "dude" would be driving a black Cadillac. The UC informed Benson that he would be sending one of his associates (a second undercover WCDTF member, hereinafter referenced as UC2) to meet with Benson's "dude." UC2 and WCDTF members proceeded to the Dayton Mall and parked in the parking lot. Several minutes later, a black Cadillac sedan arrived and the driver (unknown black male) exited the vehicle and made contact with UC2. UC2 provided the unknown black male $1,200 in pre-recorded U.S. currency and the subject provided UC2 three ounces of suspected crystal methamphetamine, which later field tested positive for the presence of methamphetamine. Following the transaction, myself and FBI Task Force members followed the unknown black male driving the black Cadillac sedan. The subject drove straight back to **Location 2** and entered the residence. Benson's silver Buick sedan was still parked in the driveway of **Location 2** when the subject returned.

12. On or about January 29, 2021, FBI Task Force Officer (TFO) Fred Zollers conducted a spot check at **Location 2** and observed the black Cadillac sedan (driven by the seller on January 28, 2021) parked at the residence. That same day, TFO Zollers was contacted by an individual, hereinafter referred to as Confidential Source One (CS1). CS1 has provided TFO Zollers with truthful and reliable information in the past which has been corroborated by independent investigation. CS1 is providing TFO Zollers information in exchange for consideration in a pending criminal prosecution. CS1 identified **Location 2** by address and advised that the residence is currently being used as a drug stash house.

13. On the morning of February 1, 2021, FBI TFO Zollers conducted a spot check at **Location 1** and observed Benson's vehicle parked at the residence. Later that day, the UC communicated via cell phone with Benson about purchasing one half pound of crystal

methamphetamine. Benson agreed to sell that amount to the UC and indicated he was ready. Following the aforementioned communication between the UC and Benson, I and TFO Zollers initiated surveillance at **Location 2**. During surveillance, we observed Benson show up driving his silver Buick sedan. Benson entered **Location 2** for a short period of time and then left. I and TFO Zollers observed additional vehicles and individuals arrive and leave **Location 2**; based on my training and experience, this activity — i.e., frequent foot traffic at a residence – is consistent with a pattern of drug trafficking activities. I also noticed multiple electronic surveillance cameras mounted on the exterior of **Location 2**. Based on my training and experience, I know drug traffickers install surveillance cameras on their residences and stash houses to alert them of law enforcement presence or the presence of their adversaries.

## CONCLUSION

14. Based on the facts set forth in the Affidavit, I believe there is probable cause that evidence associated with the above listed drug trafficking offenses are located within the residences and surrounding curtilage of **Location 1** and **Location 2**.

_Robert M. Buzzard_
Robert Buzzard
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me on this
___ day of February, 2021

HONORABLE ELIZABETH PRESTON DEAVERS
UNITED STATES MAGISTRATE JUDGE

Attachment A-1

**Location 1:** The place to be searched is 101 Bennington Dr., Dayton, Ohio 45405 and the surrounding curtilage. 101 Bennington Dr., Dayton, Ohio is within a single-story duplex that also houses 99 Bennington Dr. 101 Bennington Dr., Dayton, Ohio is constructed of red brick and is positioned on the west end of the duplex or on the right side as you face the front of the duplex. 101 Bennington Dr., Dayton, Ohio 45405 is further depicted in the following photograph.



E2-0 18-013- 0003 2019-04-15

Attachment A-2

**Location 2:** The place to be searched is 3821 Cavanaugh Rd, Dayton, Ohio 45405 and the surrounding curtilage. 3821 Cavanaugh Rd, Dayton, Ohio is single-story tan brick residence with white trim. The house numbers "3821" appear in black and are affixed on the front of the residence, next to the garage door. 3821 Cavanaugh Rd, Dayton, Ohio 45405 is further depicted in the following photograph.



## ATTACHMENT B

## PROPERTY TO BE SEIZED

The items to be searched for and seized are evidence, contraband, fruits of crime, and other items illegally possessed, as well as property designed for use, intended for use, relating to violations of 21 U.S.C. §§ 846 and 841(a)(1) including, but not limited to:

A. Log books, records, payment receipts, notes, and/or customer lists, ledgers, and other papers or electronic records relating to the transportation, ordering, purchasing, processing, and distribution of controlled substances.

B. Papers, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, and/or records, and other items relating to domestic and foreign travel to obtain and distribute narcotics and narcotics proceeds, including, but not limited to airline receipts, vehicle rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, truck logs, travel agency vouchers, notes, records of long distance telephone calls, e-mail and other correspondence.

C. Address and/or telephone books and papers reflecting names, e-mail and physical addresses and/or telephone numbers of individuals, partnerships, or corporations involved in drug trafficking and money laundering.

D. Financial records, financial statements, receipts, statements of accounts and related bank records, money, drafts, letters of credit, money orders and cashier's checks receipts, passbooks, bank checks, escrow documents, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

E. Electronic equipment such as surveillance video and related equipment, pagers, computers, electronic organizers, facsimile machines, cellular telephones, caller ID, telephone answering machines, police scanners and two-way radios, money counters.

F. United States currency, precious metals, coins, bullion, jewelry, and financial instruments, including, but not limited to stocks and bonds.

G. Photographs and/or photographic albums or video tapes and recordings of houses and other real estate, automobiles, and of other assets, persons, and/or controlled substances.

H. Indicia of occupancy, residency, and/or ownership of the premises and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, and vehicle registrations.

I. Illegal drugs, including but not limited to methamphetamine, and other materials, paraphernalia and/or equipment and tools used in the drug trade.

J. Firearms and ammunition.